**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARK PAUL STUART SR.,** | ) | **CASE NO. 1:26-CV-01154-DAP** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **JUDGE DAN AARON POLSTER** |
| **v.** | ) | |
| | ) | |
| **AMERICAN ASSOCIATION OF AUTOMATIC DOOR MANUFACTURERS,** | ) | **OPINION AND ORDER** |
| | ) | |
| **Defendant.** | ) | |

On August 12, 2026, Defendant American Association of Automatic Door Manufacturers ("AAADM") moved to dismiss the first amended complaint (ECF Doc. 9, the "FAC") filed by Plaintiff Mark Paul Stuart Sr. ("Stuart"), pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (the "MTD"). ECF Doc. 10. Stuart filed a brief in opposition on September 8, 2026 (the "Opposition"), alternatively moving the Court for leave to file a second amended complaint (the "SAC"). ECF Doc. 11. AAADM filed its Reply on September 22, 2026. ECF Doc. 12. Because Stuart has not alleged sufficient facts under the *Twombly*/*Iqbal* standard of review, AAADM's motion to dismiss is **GRANTED**. Additionally, because amendment would be futile, Stuart's motion in the alternative to file a second amended complaint is **DENIED**.

## I. BACKGROUND

Stuart works as a commercial locksmith and automatic door inspector in Pace, Florida. ECF Doc. 9 at 5, ¶ 6. AAADM is a trade association of automatic door manufacturers headquartered in Cleveland, Ohio. *Id.* at 5, ¶¶ 7-8. AAADM administers an inspector safety certification program. *Id.* at 8, ¶ 16; *Id.* at 13, ¶ 33.

AAADM's certification training is based on American National Standards Institute ("ANSI") and Builders Hardware Manufacturers Association ("BHMA") safety standards, versions A156.10, A156.19, and A156.38. *See* ECF Doc. 9-2 (Ex. B) at PageID # 111. One criterion for the program is that candidates must have "worked in the automatic pedestrian door industry." *Id.* AAADM defines such work as employment by a company that "sells, services, or installs automatic pedestrian doors as its primary business." *Id.* Further, AAADM defines such a company as one deriving over fifty percent of its business from the sale, service, or installation of automatic doors or one distributing door products for an AAADM member. *Id.* at PageID # 111, 114; *see also* ECF Doc. 9 at 8-9, ¶ 18 (characterizing this criterion as requiring "anyone seeking AAADM certification to derive 50% of their gross revenue explicitly from the sale, service, or installation of automatic pedestrian doors"). Stuart held AAADM certification from 2022 through January 31, 2026. ECF Doc. 9 at 5, ¶ 6.

On May 18, 2026, Stuart filed a complaint *pro se*, bringing federal antitrust claims under the Sherman and Clayton Acts against AAADM. ECF Doc. 1. Following AAADM's first motion to dismiss on July 13, 2026 (ECF Doc. 7), Stuart filed the FAC without seeking leave under Fed. R. Civ. P. 15(a)(2) (ECF Doc. 9). Nevertheless, the Court permitted Stuart to amend. The FAC includes the following claims: (1) concerted restraint of trade and horizontal group boycott, in violation of 15 U.S.C. § 1 ("Section 1"); and (2) conspiracy to monopolize and monopoly leverage via proxy, in violation of 15 U.S.C. § 2 ("Section 2"); with (3) a request for damages to be trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15. ECF Doc. 9 at 12-15.

Stuart alleges that his multidisciplinary business model precludes him from eligibility for AAADM's certification, given an inability to meet the "primary business" criterion. *See id.* at 9-12, ¶¶ 21-25. Therefore, Stuart alleges, he did not pursue AAADM certification renewal in

February 2026. *See id.* at 11, ¶ 25; *see also* ECF Doc. 9-3 (Ex. C) at PageID #117 ("I decided not to re-certify because the 'primary business' requirement might bring into question the legitimacy of my AAADM credentials as an expert witness.").

Stuart also asserts that this same preclusion creates a "100% bottleneck," produces a barrier to entry for "independent professionals but for the 'primary employment' restriction," and restricts competition by excluding these independent, multidisciplinary business owners. ECF Doc. 9 at 8, ¶ 16. Relatedly, Stuart contends that the "primary business" criterion restricts the supply of certified inspectors, eliminates lower price options, and limits consumer choice. *Id.* at 12, ¶ 26. Consequently, Stuart alleges injury to his own "competitive capability" and "injury to competition itself." *Id.* at 12, ¶¶ 25, 26.

## II. LAW & ANALYSIS

### A. AAADM's Motion to Dismiss

An action may be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for plaintiff's lack of standing. *Afridi v. Nat'l City Bank*, 509 F. Supp. 2d 655, 659 (N.D. Ohio 2007) (citing *Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536 (6th Cir. 2004); *AFGE v. Babbitt*, 46 F. App'x 254 (6th Cir. 2002)). "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 331 (2016). A plaintiff must suffer an "injury in fact": an invasion of a legally protected interest, which is concrete, particularized, and actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In addition, the injury must be "fairly traceable" to the challenged conduct and likely that a favorable decision will redress the injury. *Id.* at 560–61.

An action may also be dismissed if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint must contain a "short and plain statement

of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Additionally, to survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). A claim is facially plausible when pled with "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "asks for more than a sheer possibility that a Defendant has acted unlawfully." *Id.* A "naked assertion" lacking "further factual enhancement" does not rise to the level of plausibility. *Twombly*, 550 U.S. at 557. Similarly, reciting the elements of a cause of action or legal conclusions will not suffice. *Iqbal*, 556 U.S. at 678.

While courts hold *pro se* complaints to less stringent standards than those prepared by attorneys, a *pro se* plaintiff must still satisfy the pleading standard set forth in *Twombly* and *Iqbal*. *See, e.g.*, *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (applying the *Twombly*/*Iqbal* standard to review prisoner complaint under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii) for failure to state a claim).

In reviewing a motion to dismiss, federal courts must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff. *See Watkins v. Healy*, 986 F.3d 648, 660 (6th Cir. 2021); *Am. Canoe*, 389 F.3d at 540. However, the court need not accept "unwarranted factual inferences." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008).

**1. *Standing***

AAADM argues that, because Stuart has not alleged a concrete, non-speculative injury, Stuart lacks Article III standing. ECF Doc. 10 at 6-7. The Court agrees. The FAC does not allege that (1) Stuart submitted a certification renewal application; (2) AAADM threatened to or did deny

Stuart's recertification; or (3) Stuart plans to reapply. *See id.* at 6. Moreover, Stuart admitted that he decided not to recertify in order to safeguard his expert witness business. ECF Doc. 9-3 (Ex. C) at PageID # 117. AAADM fairly argues that Stuart's request in equity for certification reinstatement is not proper because the FAC does not allege that AAADM revoked a credential that can be reinstated. ECF Doc. 10 at 7 ("An order compelling reinstatement therefore would remedy a hypothesized denial rather than an existing AAADM decision.")

For its part, the FAC alleges that AAADM coerced Stuart's nonrenewal through the "primary business" requirement. ECF Doc. 9 at 11, ¶ 25. Stuart goes on to reason, "When Plaintiff was certified no conflict existed. The conflict causing injury came to the plaintiff from the past. . . . Success is not predictable as an entrepreneur." *Id.* Thus, the FAC intimates, AAADM forced Stuart to either "destroy [his] authentic legal business model to maintain an essential industry credential" or "abandon his AAADM credential." *Id.* at 11-12, ¶ 25. Stuart later points to "a yearly renewal agreement containing an explicit warranty of compliance" with the certification criteria as evidence of coercion. ECF Doc. 11 at 2.

However, most of these statements are unsupported inferences. The cause of the alleged injury is Stuart's self-imposed inability to comply with the "primary business" requirement. Stuart was not coerced into doing anything. Being coerced to relinquish certification requires a subversion of power and will. *See* ECF Doc. 9 at 11, ¶ 25 ("The cause of Plaintiff's injury was coercive in nature and not a real choice of free will by plaintiff."). Stuart let his certification lapse without attempting to recertify. *See id.* To argue that Stuart could do nothing other than let the certification lapse and could do nothing to comply with the criterion is disingenuous. *See id.* What's more, Stuart's own FAC exhibit evidences the fact that Stuart's desired business model led him to decide not to seek recertification. ECF Doc. 9-3 (Ex. C) at PageID # 117.

Alternatively, Stuart cites Sixth Circuit case law to argue that AAADM's factual challenge to Stuart's standing is "intertwined with the merits," requiring the Court to "look beyond the pleadings" and give summary judgment review presumption under Fed. R. Civ. P. 56. ECF Doc. 11 at 4 (citing *Cartwright v. Garner*, 751 F.3d 752, 759–60 (6th Cir. 2014)). Indeed, the Court may consider evidence extrinsic to the complaint when reviewing a factual—rather than facial—12(b)(1) challenge. *Cartwright*, 751 F.3d at 760; *see also* ECF Doc. 10 at 5-7 (characterizing AAADM's Article III argument as a factual 12(b)(1) challenge). Yet the *Cartwright* court did not inject Rule 56 standards into its 12(b)(1) assessment. *See Cartwright*, 751 F.3d at 759–62. To be clear, considering evidence other than documents attached to, incorporated by, or referred to in the pleadings converts Rule 12(b)(6) or 12(c) review to Rule 56 analysis. *Whittiker v. Deutsche Bank Nat'l Tr. Co.*, 605 F. Supp. 2d 914, 924 (N.D. Ohio 2009); *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000); *see also* Fed. R. Civ. P. 12(d). That is not the situation here.[1]

Next, Stuart argues that the futility doctrine applies, given AAADM's "ironclad, self-executing exclusionary barrier," precluding Stuart from having to apply for recertification to establish injury. ECF Doc. 11 at 4 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365–66 (1977)). The Opposition also asserts that if "a policy makes disqualification an absolute mathematical certainty," then the plaintiff need not act to generate an injury. *Id.*

However, Stuart first cites an employment discrimination case. *Id.*; *see also Teamsters*, 431 U.S. at 328. Notably, Stuart did not cite case law applying the context-specific reasoning in

[1] For one thing, this injury analysis concerns a Rule 12(b)(1) challenge, not 12(b)(6) or 12(c). Regardless, the Court need not consider extrinsic evidence here, but may. For example, AAADM counters that the "primary business" requirement was in place when Stuart initially certified, belying Stuart's allegation of injury. ECF Doc. 12 at 9 (citing Supp. Zgrabik Decl. ¶¶ 5-6, 8-10). However, the Court relies instead on the FAC; Stuart's letter of February 18, 2026, attached to the FAC, which admits he voluntarily decided not to renew certification; and documents incorporated by reference to the FAC.

*Teamsters* to antitrust injuries.[2] The Court declines to do so. In addition, the Opposition's second citation is incorrect. The case name, *Arrington v. Election Sys. & Software, Inc.*, does not correspond to the reporter citation provided nor apparently to any existing case. The opinion associated with that citation has nothing to do with the futility doctrine.[3] Therefore, the second citation was likely generated by unreliable AI research, upon which the Court does not look kindly.

Finally, Stuart concludes that AAADM's credential is an indispensable facility because several commercial property insurance underwriters, such as Liberty Mutual, "strictly mandate" annual inspections by certified professionals to maintain liability coverage. ECF Doc. 11 at 4. Similarly, Stuart contends that hospital compliance systems, enforced by the Joint Commission's life safety audits, "mandate documented AAADM compliance labels to maintain federal healthcare funding." *Id.* at 4-5. In effect, Stuart argues, because facility managers cannot substitute uncertified personnel without voiding insurance and violating code, AAADM created a bottleneck. *Id.* Yet the FAC does not proffer facts to support these naked assertions. Expressing the facility theory and using the word "bottleneck" in such a conclusory fashion does not allege an injury.

For the above reasons, Stuart has not alleged a concrete, particularized, actual or imminent invasion of a legally protected interest that is fairly traceable to AAADM's alleged conduct and likely to be redressed by the requested relief.

**2. *Section 1 of the Sherman Act***

Even if Stuart had Article III standing, the claims cannot survive the MTD. To prevail in a Section 1 action, a plaintiff must establish that "defendants combined or conspired with an intent

---

[2] "If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs." *Teamsters*, 431 U.S. at 365.

[3] *See Dolgencorp, Inc. v. Miss. Band of Choctaw Indians*, 746 F.3d 167, 169, 177 (5th Cir. 2014) (ruling that the tribal court properly exercised jurisdiction given the party's consensual relationship with the tribe and despite the imposition of punitive damages on a nonmember).

to unreasonably restrain trade." *Re/Max Int'l, Inc. v. Smythe, Cramer Co.*, 265 F. Supp. 2d 882, 899 (2003) (quoting *Smith v. N. Mich. Hosps., Inc.*, 703 F.2d 942, 949 (6th Cir. 1983)). Specifically, a plaintiff must prove (1) the defendant possessed monopoly power (2) in a properly defined market; (3) the plaintiff was injured; (4) defendant's conduct caused antitrust injury; and (5) plaintiff suffered damages. *Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783, 786 (6th Cir. 2005). Analysis of anticompetitive effect is unnecessary, however, if the challenged conduct is per se unlawful. *Expert Masonry, Inc. v. Boone Cnty., Ky.*, 440 F.3d 336, 342 (6th Cir. 2006).

AAADM argues that the FAC fails to state a claim under Section 1 of the Sherman Act ("Section 1") for several reasons: the FAC (1) cannot invoke per se treatment because the "primary business" requirement has a procompetitive explanation; (2) does not properly establish a geographic market; (3) conflates share of upstream manufacturing market with power in the downstream services market; (4) does not identify actual competitive harm; (5) does not plead antitrust injury; and (6) does not allege a chain of proximate causation. *Id.* at 8-16.

**i. Per Se**

Certain conduct has long been categorically barred: horizontal price fixing, territorial market division, and group boycotts. *See, e.g.*, *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958) (collecting cases); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 907 (6th Cir. 2003) (collecting cases). Generally, per se unlawful conduct entails "such predictable and pernicious anticompetitive effect, that there is limited potential for procompetitive benefit." *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 271 (6th Cir. 2014) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). Consequently, courts are reluctant to impose per se rules on restraints "where the economic impact . . . is not immediately obvious." *State Oil*, 522 U.S. at 10 (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458–59 (1986)). Stuart carries the burden to show that per se

treatment of the credential requirement is justified. *See Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 731 (6th Cir. 2019) (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*, 472 U.S. 284, 298 (1985)).

Here, the "primary business" requirement does not constitute a group boycott, as Stuart assumes. *See* ECF Doc. 9 at 13, ¶ 29. A group boycott depends on horizontal competitors' concerted refusal to deal with other entities. *See Re/Max Int'l v. Realty One, Inc.*, 900 F.Supp. 132, 158 (N.D. Ohio 1995) (collecting cases). But Stuart has not alleged how the AAADM itself qualifies as a horizontal competitor of its association members. Stuart also has not alleged that these competitors, through the certification criterion, refused to deal with uncertified technicians. The FAC, therefore, apart from using the phrase "group boycott," has not alleged one.

In addition, the "primary business" requirement does not have such an obvious, predictable, or pernicious anticompetitive impact. Stuart, in fact, struggles to articulate the exact contours of the anticompetitive impact. *See infra* Sections II.A.2.ii-v. Moreover, AAADM accurately notes that trade associations' safety standards and peer review accreditation decisions can serve public purposes and enhance competition. ECF Doc. 10 at 11 (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988); *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 530–31 (6th Cir. 2001)). Accordingly, the Court cannot categorically condemn a credential requirement.

Stuart attempts to undercut AAADM's procompetitive explanation by asserting that such a justification "is an intense factual question requiring extensive discovery and expert testimony; it cannot be summarily decided on a Rule 12(b)(6) motion to dismiss." ECF Doc. 11 at 7. To the contrary, although involving facts, the question of whether challenged conduct falls under the per se category is one of law. *See Med. Ctr. at Elizabeth Place*, 922 F.3d at 727–28 (rejecting the

argument that whether a challenged restraint is procompetitive is "quintessentially one of fact," but instead a question of law) (collecting cases). And whether a pleading shows that such conduct is per se unlawful is decided at this stage. *See, e.g.*, *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1013–14, 1015 (6th Cir. 2005) (affirming the district court's grant of a motion to dismiss based on *de novo* review of plaintiff's per se and rule of reason arguments).

The Opposition also states that the safety rationale is limited because AAADM does not provide American with Disabilities Association ("ADA") training. ECF Doc. 11 at 8. First, the ADA is not the only metric for safety. Second, Stuart already asserted that the employment of uncertified technicians impacts safety. *Id.* at 6. This admission undercuts Stuart's argument that the AAADM credential does not serve the public interest by imposing safety standards.

Separately, Stuart argues that working for a company with automatic door service as its primary business does not increase knowledge or safety of automatic door inspections. *See* ECF Doc. 9 at 9, ¶ 19. The FAC and Opposition characterize the "primary business" requirement as "arbitrary" and "non-technical." *Id.* at 14, ¶ 36; ECF Doc. 11 at 9. Stuart supposes that, "[w]ith the development of AI technologies and tools, information is the key to safety and competence, not employment requirements. Intellect and the ability to inspect automatic doors are not reserved to door installers any longer. Anyone with knowledge and certification can inspect automatic doors." ECF Doc. 9 at 9, ¶ 20.

The Court disagrees with the FAC's assumptions regarding knowledge and ability in relation to safety. Information alone is not the key to competence. The capacity to access information is not equivalent to intellect. And the depth of one's knowledge, skill, and experience determines whether one can safely inspect automatic doors—not a subscription to an AI bot. Ostensibly, AAADM's requirement relates revenue percent with employers that actually operate

in the industry and employees that have actual experience in the field. Moreover, AAADM's stated mission is to "increase education, training, and professionalism among installers and service providers, and to generally promote the safe use of automatic doors." ECF Doc. 9-1 (Ex. A) at PageID # 109. It is reasonable to connect experience with ability and safe operation. Thus, AAADM offers a plausible motive behind the criterion that does not run afoul of antitrust law.

Because the FAC does not establish the criterion as a group boycott or as obviously anticompetitive conduct, Stuart has not demonstrated that per se treatment is appropriate here. As a result, the rule of reason applies.

**ii. Relevant Market**

Under the rule of reason, courts decide if a restraint qualifies as "unreasonable" by evaluating specific information about the business, conditions before and after the restraint's imposition, and the restraint's nature and effect. *State Oil*, 522 U.S. at 10 (citing *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 342–43 (1982)). To that end, rule of reason analysis focuses on (1) the relevant market structure, (2) market power, and (3) the alleged restraint's actual effect on competition. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)).

A party must demarcate a relevant market by the product market and geographic market to avoid dismissal. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719–20 (6th Cir. 2003). The product market depends on "reasonable interchangeability" based on substitute products' availability and the cross-elasticity of consumer demand. *Worldwide Basketball and Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 961 (6th Cir. 2004) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). A geographic market represents "an area of effective competition" where consumers can

"practicably" turn for alternative sources of supply. *Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1108–09 (N.D. Ohio 2004) (quoting *Re/Max Int'l Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

To support the Section 1 claim under rule of reason analysis, Stuart uses the Opposition to change the alleged market. The FAC alleges a product market of the "Nationwide Market for Commercial Automatic Pedestrian Door Safety Inspection and Compliance Services like Defendant's" and a geographic market encompassing the entire United States. ECF Doc. 9 at 6, ¶ 13; ECF Doc. 9 at 8, ¶ 17. The Opposition then specifies a regional commercial maintenance market in Florida and Alabama, as well as a "national forensic and expert witness investigation market" based on Stuart's work from New Jersey to Florida. ECF Doc. 11 at 5.

But, as the Reply notes, Stuart's attempt to amend the FAC's allegations through the Opposition is procedurally improper. *See* ECF Doc. 12 at 1-2; *see also Brown v. City of Albion, Mich.*, 136 F.4th 331, 341 (6th Cir. 2025) (declining to consider a memorandum in ruling on a motion to dismiss because the court's review is limited to the complaint, attachments to the complaint, documents in the record to which the complaint refers, and public record). Notwithstanding that error, AAADM is a trade association for manufacturers that does not operate in an expert witness market. *See* ECF Doc. 9-1 (Ex. A) at PageID # 109. In addition, Stuart's having personally worked from New Jersey to Florida, or in Alabama, does not address service substitutability, cross-elasticity, or where consumers can practicably turn for service. The FAC merely states, "There are no reasonable economic substitutes for professional certified safety inspections," without differentiating AAADM's credential from others. *See* ECF Doc. 9 at 7, ¶ 15. These deficiencies render Stuart's proposed markets undefined.

**iii. Market Power**

Stuart contends that AAADM's members have market power because they control ninety percent of the upstream manufacturing industry and "operate proprietary downstream corporate service networks that compete directly with independent service providers." ECF Doc. 11 at 5-6. Ordinarily, market power is inferred from predominant share of the market. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992). Market competitiveness, competitor strength, market trends, and barriers to entry also aid in determining market power. *Defiance*, 344 F. Supp. 2d at 1113. Stuart has not alleged AAADM's share of the downstream services market, percent of services performed by AAADM-certified technicians, price control ability, or market competition. Accordingly, Stuart has not sufficiently alleged that AAADM has market power in the downstream industry.

**iv. Antitrust Injury**

To have standing to bring an antitrust claim, a plaintiff must allege an antitrust injury. *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007). Antitrust injury is (1) the type of injury that antitrust laws were meant to prevent; (2) flowing from that which allegedly makes the conduct unlawful. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Antitrust laws seek to protect competition, not competitors; thus, plaintiff must allege injury not only to himself, but anti-competitive injury to a relevant market. *Brown Shoe*, 370 U.S. at 320.

In terms of harm, the FAC concludes that the "primary business" criterion restricts the supply of certified inspectors, increases price, eliminates customer choice, and reduces output. ECF Doc. 9 at 12-13, 15, ¶¶ 26, 30, 37. In support of this conclusion, Stuart claims, "Even AADM certified companies deploy uncertified technicians because they don't have enough certified ones causes a safety hazard." ECF Doc. 11 at 6. Here, Stuart admits that certified companies employ

uncertified technicians, which belies the assertion that the criterion reduces inspection output. Stuart also does not address how often consumers hire uncertified technicians.

The Opposition then identifies twelve commercial maintenance aggregation platforms for which active AAADM licensure is allegedly a prerequisite to bid on or perform door repair and inspection contracts. ECF Doc. 11 at 7. But this was not alleged in the FAC and cannot be shoehorned into the Opposition. *See City of Albion*, 136 F.4th at 341 (declining to consider a memorandum in ruling on a motion to dismiss because the court's review is limited to the complaint, attachments to the complaint, documents in the record to which the complaint refers, and public record). In any event, merely naming these twelve platforms does not equate to alleging facts that, if proven, show market power. *See CBC Cos., Inc. v. Equifax, Inc.*, 561 F.3d 569, 572–73 (6th Cir. 2009) (affirming the district court's dismissal because the complaint contained "only conclusory allegations, and not facts sufficient to support more than a speculative injury to competition"). Therefore, Stuart has not alleged harm recognized under antitrust law.

**v. Proximate Causation**

AAADM argues that Stuart does not plead proximate causation as required to bring a Section 1 claim. ECF Doc. 10 at 15. A tenuous, speculative relationship between the alleged antitrust violation and injury weighs against a finding of proximate causation. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983). The FAC obliquely outlines a hypothetical chain of events in which competitors are "forced" to not recertify and are excluded from the industry. ECF Doc. 9 at 11-12, ¶¶ 25-26. But Stuart does not identify instances in which customers declined to hire uncertified companies, including his own. Stuart has not specified cost increases or lost sales. In other words, Stuart has not alleged a non-speculative relationship between AAADM's allegedly unlawful conduct and an antitrust injury. In sum, Stuart

has not alleged facts which, if proven, would show a Section 1 violation under a rule of reason analysis.

**3. *Section 2 of the Sherman Act***

AAADM argues that the FAC fails to state claims under Section 2 for similar reasons: the FAC (1) does not properly define a market; (2) does not allege AAADM's share of the market, exclusionary conduct by AAADM in the market, nor facts sufficient to demonstrate that AAADM's credential program is an essential facility; (3) does not allege facts regarding a specific intent to monopolize or dangerous probability of achieving monopoly power, sufficient to support an attempted monopolization claim; (4) does not allege facts about an agreement among AAADM members sufficient to establish a conspiracy to monopolize; and (5) cannot substitute monopoly leveraging for failure to meet Section 2 elements. ECF Doc. 10 at 16-19. Lastly, AAADM points out that failure to state Section 1 and Section 2 claims precludes Clayton Act recovery. *Id*. at 19.

**i. Monopolization**

A Section 2 monopolization claim rests on the following elements: (1) monopoly power (2) in a relevant market and (3) willful acquisition, maintenance, or use of that power by anticompetitive means. *Superior Prod. P'ship v. Gordon Auto Body Parts Co., Ltd.*, 784 F.3d 311, 318 (6th Cir. 2015). Stuart argues that he has stated valid claims against AAADM for many of the same reasons stated above. *See* ECF Doc. 11 at 8-10. The Court is unpersuaded.

***First***, the FAC relies on the same undefined market as discussed above. *See supra* Section II.A.2.ii. ***Second***, the FAC again highlights AAADM's "90% share of the upstream manufacturing market and a dominant share of the lucrative downstream compliance, service, and inspection markets." ECF Doc. 9 at 14, ¶ 34. The Opposition then alleges that AAADM wields monopoly power because downstream insurance and healthcare standards transform AAADM's certification

into an "absolute need." ECF Doc. 11 at 8-9. But this is a supposition without a factual allegation. The threshold for proving monopoly power is higher under Section 2 than Section 1. *Eastman Kodak*, 504 U.S. at 481. Stuart does not establish the portion of the market that such insurance and healthcare standards allegedly afford AAADM. Stuart does not account for other insurers or healthcare systems, or other credentials that may be accepted. In effect, Stuart does not address whether consumers can reasonably hire uncertified technicians. To adequately allege that AAADM had market power for a Section 2 claim, the FAC needed to allege actual price control, actual competitor exclusion, or high share of a defined market. *See Rodney*, 146 F. App'x at 789. Stuart has not done that.

Stuart then cites *Virtual Maint. v. Prime Comput.*, 11 F.3d 660 (6th Cir. 1993), to support the conclusion that AAADM cannot deploy control over an "essential secondary input to force market participants into an uncompetitive secondary service market." ECF Doc. 11 at 9. Yet the issues that the Sixth Circuit reviewed when determining the correct market there do not mirror the facts here. Unlike in *Virtual Maintenance*, Stuart has not offered a narrowly defined product market in which AAADM has market power and in which AAADM financially benefits through its manipulation of choice. *See Virtual Maint.*, 11F.3d at 664–66. Despite Stuart's attempt to create a parallel, in *Virtual Maintenance*, the *customers* had little choice. *Id.* at 666. Here, Stuart emphasizes harm to *competitors'* ability to stay in the field. ECF Doc. 9 at 11-12, ¶ 25. Moreover, Stuart remarks only in a conclusory fashion that this supposed effect on competitors raises prices and restricts customer choice. *See id.* at 12, ¶ 26; ECF Doc. 11 at 9. Yet no facts are alleged to support these inferences. Thus, Stuart has not established market power in a relevant market.

***Third***, Stuart invokes the essential facilities doctrine, suggesting credential restriction amounts to anticompetitive means of attaining monopoly power. *See* ECF Doc. 9 at 1 & 7-8, ¶ 16.

Stuart argues that "access to the annual renewal examination is indispensable to competing in 90% of the commercial repair market." ECF Doc. 11 at 10. In the Sixth Circuit, refusal to provide reasonable access to an essential facility constitutes anticompetitive behavior that supports a monopolization claim. *Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.*, 833 F.2d 606, 612 (6th Cir. 1987). An essential facility cannot be "practicably" duplicated because doing so would be "economically infeasible." *Id.* Refusing access must inflict "severe handicap" on competitors. *Id.*

Here, Stuart's allegation that AAADM certification is one of several credentials that some market participants prefer does not establish its "essential" status. Stuart also has not distinguished the "commercial repair market" and the safety inspection market to which AAADM certification applies. No facts indicate that an alternative would be economically infeasible. In addition, Stuart has not demonstrated that he has lost access to the certification. Finally, Stuart's allegations do not indicate a "severe" injury to competitors. Thus, the essential facilities doctrine does not support Stuart's Section 2 monopolization claim.

Finally, Stuart does not offer sufficient facts to allege actual exclusion or barriers to entry in inspection services, or customer dependence on AAADM certification. As with the Section 1 claim, Stuart does not allege a Section 2 antitrust injury, relying instead on mere surmise. *See* ECF Doc. 9 at 13, ¶ 30 ("[T]he rule produces severe anticompetitive effects by reducing output, inflating prices for end-users, and foreclosing market access to independent professionals.")

**ii. Attempted Monopolization, Conspiracy to Monopolize, and Monopolization Leveraging via Proxy**

Besides monopolization, the FAC references several other claims under Section 2. ***First***, Stuart appears to allege attempted monopolization. *See id.* at 10, ¶ 23 ("By forcing independent professionals to choose between downsizing their diversified business such as Plaintiff, or close their business, is an attempt to restrict competition because it requires decertification."); *see also*

ECF Doc. 11 at 9 (same). The elements of attempt to monopolize under Section 2 include (1) specific intent to monopolize; (2) anticompetitive conduct; and (3) a dangerous probability of achieving monopoly power. *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1431 (6th Cir. 1990). Factors such as strength of competition, probable development of the industry, barriers to entry, the anticompetitive conduct's nature, and demand elasticity assist a court in determining whether a dangerous probability of achieving monopoly power exists. *Scooter Store, Inc. v. SpinLife.com, LLC*, 777 F. Supp. 2d 1102, 1117 (S.D. Ohio 2011). But Stuart has not alleged specific facts in connection with these factors nor has he directly established that AAADM is likely to achieve monopoly power in the inspection market due to the credential criterion. *See supra* Sections II.A.2.iii-v. In addition, the FAC merely declares that AAADM and its board members "possessed the specific intent to acquire and maintain a monopoly" without any factual allegation. ECF Doc. 9 at 14, ¶ 36. Therefore, Stuart does not allege the elements.

***Second***, Stuart brings a conspiracy to monopolize claim under Section 2. ECF Doc. 9 at 13. Conspiracy to monopolize claims require identification of the relevant markets and proof of concerted activity. *Superior Prod.*, 784 F.3d at 318 (citing *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 574 (6th Cir. 1986)). Stuart alleges that AAADM "actively participated in a horizontal conspiracy with its Board Members to leverage AAADM's absolute monopoly over the certification credential to suppress, foreclose, and destroy independent, lower-cost horizontal competition." ECF Doc. 9 at 14, ¶ 35; ECF Doc. 11 at 12. However, Stuart offers no facts regarding the circumstances or conditions of the supposed agreement among AAADM board members.[4]

[4] Although AAADM did not argue that it cannot conspire with itself, the Court notes Stuart alleges a conspiracy between AAADM and its board members. *See* ECF Doc. 9 at 6, ¶ 9 (defining "Board Members" as including, without limitation, four entities); ECF Doc. 9 at 14, ¶ 35 (alleging conspiracy between AAADM and its "Board Members"). However, an association cannot conspire with its board. *See Smith v. N. Mich. Hosps., Inc.*, 703 F.2d 942, 951 (6th Cir. 1983) ("[A] corporation cannot combine or conspire with itself[.]"); *Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 620–22, 621 n.8 (6th Cir. 1999) (holding that the

Crucially, Stuart confuses what an entity might have a monopoly over, conflating a trade association credential with a market. Other than simply reciting that AAADM board members had specific intent to monopolize and that they executed this intent through the "primary business" requirement, Stuart has not alleged facts pertaining to the elements of conspiracy to monopolize. *See* ECF Doc. 9 at 14, ¶ 36; ECF Doc. 11 at 12-13.

***Third***, Stuart asserts that AAADM leverages its credential's import in the industry to restrict competition downstream and create a monopoly for its members. *See* ECF Doc. 9 at 14, ¶ 35; ECF Doc. 11 at 9-10. Monopoly leveraging describes the use of monopoly power in one market to restrain competition in a second market. *White and White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 506 (6th Cir. 1983). But Stuart attempts to substitute monopoly power in a market with control over a credential, offering no legal support for this approach. Stuart also does not establish that upstream manufacturing market power enables leveraging of the downstream service market. The FAC and Opposition do not provide facts explaining how AAADM's credential creates a monopoly exclusively for AAADM board members or forecloses access to other credentials or to uncertified technicians. *See supra* Section II.A.2. As above, Stuart offers naked assertions. Therefore, the Section 2 "monopoly leveraging via proxy" claim fails.

The Court agrees with AAADM that Stuart has not alleged enough facts to plead the claims against AAADM. Because Stuart failed to plead claims under the Sherman Act, the requested Clayton Act remedies do not apply. *See* ECF Doc. 9 at 15; *see also* 15 U.S.C. §§ 15 and 26.

### B. <u>Stuart's Motion in the Alternative for Leave to File a Second Amended Complaint</u>

---

defendant board association could not conspire with its "member diplomates" under the Sherman Act because they were not independent entities, as the diplomates controlled the board and "presumably" acted in the board's interest).

Courts grant leave to amend freely "when justice so requires." Fed. R. Civ. P. 15(a)(2). But courts may deny leave if, for instance, amendments repeatedly fail to cure deficiencies or if amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Amendment is futile when the proposed amended complaint could not withstand a motion to dismiss. *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (citing *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 382–83 (6th Cir. 1993)). Thus, the Court applies the same *Twombly*/*Iqbal* standard to evaluate a proposed amended complaint as under a Rule 12(b)(6) motion. *See Donahue v. Travelers Cos., Inc.*, No. 5:24-cv-01141, 2024 WL 4534250, at *2 (N.D. Ohio Oct. 21, 2024).

Stuart's proposed SAC includes (1) a revised geographic market; and (2) the names of twelve commercial facility maintenance aggregation platforms, which allegedly mandate that subcontractors hold AAADM credentials. *See* ECF Doc. 11-3 (Ex. C) at PageID # 207-09.

These revisions do not cure the deficiencies detailed above and, thus, likewise would not withstand a motion to dismiss. *See supra* Section II.A. The proposed SAC does not properly define a market, based on AAADM certificate substitutability and demand cross-elasticity. The proposed SAC also does not allege that (1) AAADM has a high market share downstream, (2) AAADM can control prices, (3) AAADM exhibited intent to monopolize, (4) AAADM decertified Stuart, (5) Stuart is barred from a vendor roster, (6) Stuart or other technicians (either uncertified or holding non-AAADM certification) have lost bids, or (7) consumers have refused to hire such technicians. In short, the proposed SAC does not allege facts sufficient to plead the claims' elements. *See In re Passenger Vehicle Replacement Tires Antitrust Litig.*, No. 5:24-md-3107, 2026 WL 879018, at *44–45 (N.D. Ohio Mar. 31, 2026) (denying motions for leave to amend because additional alleged facts were still insufficient under *Twombly* and *Iqbal* to plausibly plead Section 1 concerted action in light of more likely explanations). Therefore, granting leave to amend would be futile.

## IV. CONCLUSION

For the foregoing reasons, AAADM's motion to dismiss (ECF Doc. 10) is **GRANTED**. In short, Stuart has not alleged facts sufficient to avoid dismissal of his first amended complaint under the *Twombly*/*Iqbal* standard. In addition, as amendment would be futile, Stuart's motion in the alternative for leave to file a second amended complaint (ECF Doc. 11) is **DENIED**.

**IT IS SO ORDERED.**

Dated: October 5, 2026

*s/ Dan Aaron Polster*
United States District Judge